**COMMONWEALTH OF MASSACHUSETTS**
**SUPREME JUDICIAL COURT**

**SJC NO. 27279**

**APPEALS COURT**

**No. 2018-P-0346**

**COMMONWEALTH**

**v.**

**JEREMY LIBBY**

**APPLICATION OF THE DEFENDANT-APPELLANT FOR**
**FURTHER APPELLATE REVIEW OF A DECISION**
**OF THE MASSACHUSETTS COURT OF APPEALS**

Suzanne LeVert
Attorney for Defendant
BBO# 684060
LeVert Law
203 Washington Street #120
Salem, Massachusetts 01970
(978) 741-0800
levertlaw@gmail.com

FEBRUARY 29, 2020

1

## APPLICATION FOR FURTHER APPELLATE REVIEW

The defendant-appellant, pursuant to Mass. R.A.P. 27.1 and in the interest of justice, hereby applies for further appellate review of the Appeals Court's decision, issued December 20, 2019, that affirmed his conviction of four counts of forcible rape of a child, (Add. 1-12)

## STATEMENT OF PRIOR PROCEEDINGS

On June 27, 2012, Jeremy Libby was indicted on four charges of rape of a child with force and four charges of indecent assault and battery on a child under 14 (RA 2)[1] He was arraigned on those charges on August 22, 2012, when he pleaded not guilty. (RA 4) He was released on his personal recognizance (RA 6), on which he remained without incident until his conviction on January 6, 2017. (RA 12)

The delays began when Mr. Libby's trial judge took more than six months (November 22, 2013) to grant his Motion to Suppress a Statement. On December 2, 2013, the Commonwealth filed a Notice of Interlocutory Appeal and a Motion for Stay of Proceedings. (RA 7) Three months later, on March 19, 2014, the Supreme Judicial Court

---

[1] Cites to RA xx reference cites in the Record Appendix; Tr. M-xx to the Motion Hearing transcript; Tr. Volume xx--xx to the volume and page number of the trial transcript, and App x refers to the Appeals Court decision. KC is the pseudonym chosen for the alleged victim.

ordered leave for the Commonwealth to pursue its interlocutory appeal. (RA 7)  This Honorable Court took a year and five months after that: on August 6, 2015, this Honorable Court affirmed the suppression of Mr. Libby's statement of June 28, 2012. (RA 8)

At the same time as the Motion to Suppress litigation slowly progressed, Mr. Libby filed several motions in September and October 2013 related to the DNA testing results allegedly found on a pair of K.C.'s underwear,  (RA.7) Because of an error in the lab that tainted the original testing,  and a "medical leave" requested by a lab analyst, Mr. Libby provided another DNA sample when requested by the Commonwealth on March 31, 2016, which caused several more months of delay (RA. 7)

On January 3, 2017, the defense Motion in Limine to Exclude DNA Evidence was argued. (RA 11, Tr. I-4) Defense counsel argued that presenting to the jury evidence of the semen DNA found on what were alleged to be K.C.'s underwear and identified as Mr. Libby's would be irrelevant and far more prejudicial than probative. (Tr. M-14) Defense counsel reminded the court that offenses alleged consisted of "digital touch, possibly penetration," and that K.C. didn't report "seeing a penis. She didn't report any kind of contact like that." (Tr. M-14, 15)

Moreover, defense counsel argued to the judge, there were innocent explanations for the presence of semen (common laundry room and equipment), a nefarious explanation (Ms. Rivas had some bias against Mr. Libby and was the last person to have possession of a pair of

underwear she apparently brought to the hospital), and a host of chain of custody issues (how, and whose, underwear arrived at the lab remained an unanswered question throughout the trial). (Tr. M-16)

On July 18, 2016, Mr. Libby filed a Motion to Dismiss for Violation of his Right to a Speedy Trial. It took the trial court more than three and a half months to deny the motion on October 31, 2016, the court denied this motion.

On January 3, 2017, the defense Motion in Limine to Exclude DNA Evidence was argued, (RA 11, Tr. I-4), which is the subject of Argument I, *supra*. On January 4, 2017, the Commonwealth filed nolle prosequi on counts 5 through 8 (indecent assault and battery with a child under 14). A jury was impaneled, and the trial began. It lasted two days and offered four witnesses—K.C., her mother Patricia Rivas, and two DNA analysts. (RA 12)

Mr. Libby filed a motion for a required finding of not guilty at the close of the Commonwealth's evidence and at the close of all evidence on January 6, 2017, both of which were denied. (RA 12) The jury came back with a verdict of guilty on four counts of forcible rape of a child. (RA 12) On January 10, 2017, the court sentenced Mr. Libby to not less than 10 to not more than 12 years, committed, on all four counts to run concurrently. (RA 14)  Defense counsel timely filed the Notice of Appeal on January 20, 2017. (RA 15)  Mr. Libby's appeal was filed on January 14, 2019, the case was argued on November 12, 2019, and the Appeals Court decision issued on December 24, 2019.

## <u>POINTS FOR WHICH FURTHER APPELLATE REVIEW IS</u>
## <u>SOUGHT</u>

1. **Whether the Appeals Court erred when it ruled that the judge did not abuse his discretion when he admitted DNA evidence under the theory that its presence proved the defendant's "motive and intent" and "sexual attraction" to K.C.**

2. Whether the Appeals Court erred when it ruled that **the jury "could [have] reasonably conclude[d] that an item evidence was what the Commonwealth claimed it to be when the chain of custody was irreparably broken.**

3. **Whether the Appeals Court abused its discretion by failing to find that the four years it took the Commonwealth to bring Mr. Libby to trial was presumptively prejudicial and violative of Rule 36.**

## <u>SHORT STATEMENT OF FACTS</u>

This case involves a little girl, K.C., who was born with "pretty significant kidney difficulties and had had a total of four surgeries." (Tr. I:65) K.C.'s condition caused her to suffer from frequent urinary tract infections which required adult members of the family, including Mr. Libby (who had known her almost since she was born) to help her wipe her vaginal and anal areas. (Tr. I:63-66) K.C. testified that Mr. Libby continued to help her with bathroom activities when he returned to live

with the family for about two months in 2012. (Tr. I: 65, ) K.C.'s urinary tract infections caused pain and itchiness in her vaginal area. (Tr. I: 68)

At trial, K.C. testified that Mr. Libby had used his fingers to touch her "[i]n the private area where no one should be touched," both "in the back and in the front.... in the inside' of those spots." (Tr. 1: 25-26) She was never asked or testified whether "inside" meant inside of her clothing or inside of her body. (Tr. I: 25)  (and the following year, by another man who was still living with her mother while Mr. Libby visited for "a couple of months").

At the time of the 2017 trial, she was 11 years old, in fifth grade, and living with her two siblings in her grandmother's custody. (Tr. I:20-21) She identified Jeremy Libby as her "brother's dad," and a person she had known since she was "a child." (Tr. I: 22)  Ms. Rivas, K.C.'s mother and first complaint witness, testified that Mr. Libby had been in K.C.'s life since she was a month or two old and that K.C. called him "Daddy." (Tr. I: 51)  Mr. Libby had lived with the family at various times since he and Ms. Rivas separated, most recently during the summer following K.C.'s kindergarten in 2012, when she was about six years old. Her mother "invited him" to live with them for about two months (Tr: I-52

On June 27, 2012, K.C. first told her mother of that Mr. Libby had been touching her by using his fingers to touch her [i]n the private area where no one should be touched," both "in the back and in the front.... in the inside' of those spots." (Tr. 1: 25-26) She was never asked or testified whether "inside" meant inside of her clothing or inside of her

6

body cavities. (Tr. I: 25)  On June 27, 2012, a day when K.C. was suffering from a urinary tract infection. (Tr. I:30)

At the time Mr. Libby lived with K.C. and her family, Patricia Riva as married to another man, Julio Rivas, with whom she'd had a baby girl just a few months before. (Tr. I-33) The jury also learned from K.C. that "Bones," as Mr. Rivas was known, was "mean" to her mother. (Tr. I-44) K.C. admitted that she didn't miss living with her mother because her mother's difficult relationships made it hard, "... trying to help out Mom, and then trying to be a kid." (Tr. I:44)

Just a year after accusing Mr. Libby of touching her, "something happened" between K.C. and "Bones that she told her mother about, at which time Mr. Rivas "left the house," but later returned to live with her when K.C. moved in with her grandmother. (Tr. I:35) On cross-examination, K.C.'s mother testified that K.C. alleged that Bones "had in fact abused" K.C. and that K.C. first reported that abuse to her mother. (Tr. I:59) Rivas admitted she obtained a restraining order against Bones after this incident, but then modified it to allow Bones to return shortly, when K.C. and her siblings went to live with the grandmother. (Tr. I-63)

During the summer of 2012, Mr. Libby slept on the couch in the first floor living room. (Tr, I: 36) Next to the living room was a bath and laundry room, with a washer, a dryer, toilet, and a sink in it that Mr. Libby and the family used. (Tr. I: 37-38)  K.C. admitted that the "dirty laundry" would pile up "quite a few times." (Tr. I: 36)    Mr. Libby lived

in the home in exchange for rent and helping with the kids. (Tr. I: 52) He also helped with "overall house stuff, cooking and cleaning...." Rivas was a "stay-at-home mom" and she was home "a lot." (Tr. I: 52)  Mr. Libby would be alone with the kids only when she had a doctor's appointment or ran to the grocery store. (Tr. I: 52)

On the day K.C. told her that something had happened with Mr. Libby, Rivas testified that she had left K.C. and J.L. with Mr. Libby for about one hour. (Tr. I: 53) When she returned, she noticed K.C. was "scratching between her legs" and asked her what was wrong. (Tr. I: 53) K.C. told her "it was itchy; that it was bothering her." (On cross-examination, K.C. testified that she was suffering from a urinary tract infection at the time. [Tr. I: 30])

According to Rivas, K.C. went on to say that "I have that hole down there that hurts when people touch it." (Tr. I: 54) This remark apparently startled Rivas, who asked her daughter, "What people?" to which K.C. replied "Daddy touches it." (Tr. I: 54)  That was the extent of the conversation between her and K.C., according to Rivas' testimony. She said nothing about K.C. describing Mr. Libby putting his "fingers in her vagina and her anus" (or words even close to that) or about any history of such behavior.

Rivas testified that she immediately called the Palmer Police Department. (Tr. I: 55) Without the question before her, Rivas testified that "K.C. had been in the ER the night before from reporting it. And they bagged all of her belongings and everything. And Palmer PD took

8

her belongings. And they told me to bring [K.C.] to the appointment [with a Dr. Boos] so that she could speak to the doctor." (Tr. I-56)  Rivas testified that "the outfit [K.C.] was wearing the day before and the underwear she was wearing the day before. Anything that she had on when we went to the emergency got tagged." (Tr. I-56) On cross-examination, however, Ms. Rivas said that she did not bring the clothing or underwear to the Dr. Boos appointment on June 28, 2018, and that she **"never touched them."** (Tr. I-69)

Significantly, Rivas also testified that she had not noticed any changes in K.C.'s behavior toward Mr. Libby at any time. (Tr. I: 56) She was "surprised" when K.C. told her that Mr. Libby had touched her. (Tr. I: 57)

On the second day of trial, the Commonwealth and defense counsel presented a stipulation to the judge, who later gave it to the jury. (Tr. II: 6, 12; RA 22) The stipulation read as follows:

> "It is stipulated by the parties that the underwear contained in the evidence collection kit numbered 001126, Item Number 1-1-07, and tested by the Massachusetts State Police Crime Laboratory was **received by Stephen Boos at Baystate Hospital from Patricia Rivas** on **June 28, 2012**."

Defense counsel noted for the record that the acceptance of the stipulation in no way indicated that she was waiving her objection to the admission of the underwear and DNA results. (Tr. II: 9) Furthermore, defense counsel noted that the stipulation contradicted

Ms. Rivas's testimony from the day before stating that she had not brought any underwear or clothing to Dr. Boos on June 28, 2012.  (Tr. II: 9)  Immediately after hearing the stipulation, <u>Erica Nadeau, supervisor of the criminalistics unit at the Massachusetts State Police Crime Laboratory</u> testified. (Tr. II: 13)  She identified a kit number 001126 as "underpants that were received for this case, case number 129382 and the item number for this is 1-1-07." (Tr. II: 16-17) Ms. Nadeau testified that "the results for the sperm cells were positive on the front panel of the crotch cutting." (Tr. II: 20) She testified that she also collected "a sample from Jeremy Libby" by using a "foam swab rubbed inside both the cheeks....and packaged that at the lab and preserved that for DNA."

The next and final witness was <u>Tina Gryszowka</u>, who also worked at the <u>Massachusetts State Police Crime Laboratory</u>.  (Tr. III: 9) Before she testified, the judge read the jury another stipulation:

> "It is stipulated by the parties that the Massachusetts State Police Crime Laboratory received a DNA sample from Jeremy Libby and that standard was generated for DNA analysis in this case. It is further stipulated that a standard was generated from the cutting taken from the underwear that was received by Dr. Stephen Boos at Baystate Hospital on June 28, 2012. Finally, it is stipulated that the attached charts fairly and accurately represented those standards." (Tr. III:3-4; RA 23)

Gryszowka testified that "the standard for Mr. Libby's sample matched the profile from the cutting of the underpants and that "the

expected frequency of occurrence of this profile is approximately 1 in 376.0 quintillion unrelated individuals." (Tr. III-12) After Gryszowka testified, the Commonwealth closed.

The judge gave the jury limiting instructions: that the jury was not to consider the DNA testimony for anything but the "limited issues of motive and/or intent" (Tr. III:16) Defense counsel then motioned for a required finding of not guilty, arguing that the actions of Mr. Libby described by the girl were "vague and general" and what she described was "insufficient as a matter of law to find [Mr. Libby] guilty of any of these charges." (Tr. III: 18)

The jury began deliberations, sending two notes to the judge, one asking for a pair of gloves (which were provided) and the second posing a question. (Tr. III: 25) The question asked was: "According to law, the evidence obtained in the ER, may the rape kit be sealed by healthcare practitioners in the ER and not be able to be opened until the crime lab? Thanks, the jury." The judge decided he was "not going to respond to their question. The evidence is closed." The prosecutor agreed. The defense counsel suggested, "They are not to speculate about that. They are not to speculate. Remind them of the—" At which point he judge interrupted with, "I may not do that." Instead, he told the jury he would not respond to its questions, "only to say... the evidence in this case is closed" and to continue its deliberations. The jury returned a verdict of guilty on all counts less than 30 minutes after hearing that instruction. (Tr. IV-85)

11

## <u>GROUNDS FOR GRANTING APPELLATE REVIEW</u>

I.    **DID THE APPEALS COURT ERR WHEN IT RULED THAT THE JUDGE DID NOT ABUSE HIS DISCRETION WHEN HE ADMITTED EVIDENCE UNDER THE THEORY THAT IT PROVED THE DEFENDANT'S "MOTIVE AND INTENT" AND "SEXUAL ATTRACTION TO THE VICTIM"?**

Although K.C. told the police and the jury that Mr. Libby used only his fingers "in her private parts" and answered "no" when asked if she ever saw or touched his "private parts," the Commonwealth's case focused almost solely on the sperm found in a pair of underwear allegedly owned and worn by K.C. DNA evidence, identified as Mr. Libby's semen, was obtained from a pair of girl's underwear.

The Commonwealth presented no evidence—testimonial or forensic, direct or circumstantial—to the judge or jury about when or how the semen was deposited in the underwear. Over strong objection by the defense, the judge admitted the evidence, reasoning (without founding his reasoning on any behavioral scientific evidence) that the semen proved the "motive and intent" of Mr. Libby and Mr. Libby's "sexual attraction" to K.C. In fact, the judge ruled that "I find... [the evidence] is strikingly probative evidence and it is evidence that the jury has a right to hear." He made this ruling with no information about how or when the DNA made its way onto the underpants.

In addition, he abused his discretion by rejecting the defense's strong argument that it would be irrelevant—considering that the charges against Mr. Libby involved digital penetration only—and far more prejudicial than probative. (Tr. M-14) Defense counsel reminded the court that the offenses alleged consisted of "digital touch, possibly penetration," and that K.C. didn't report "seeing a penis. She didn't report any kind of contact like that." (Tr. M-14, 15)

Moreover, defense counsel argued to the judge, there were innocent explanations for the presence of semen (common laundry room and equipment), a nefarious explanation (Ms. Rivas had some bias against Mr. Libby and was the last person to have possession of a pair of underwear she apparently brought to the hospital), and a host of chain of custody issues (how, and whose, underwear arrived at the lab remained an unanswered question throughout the trial). (Tr. M-16)

"[W]e rely on a trial judge to exercise discretion in admitting only relevant evidence whose probative value is not substantially outweighed by its prejudicial or cumulative nature." *Commonwealth v. Bonds*, 445 Mass. 821, 831 (2006). Even if such evidence is relevant for other purposes, its probative value must not be substantially outweighed by its prejudicial effect. See *Commonwealth v. Sylvia*, 456 Mass. 182, 192 (2010);  Mass. G. Evidence §403 (2014) The defendant bears the burden of establishing both an abuse of discretion and the resulting prejudice. *Commonwealth. v. Gray*, 464 Mass. 731, 752 (2012)(reversing conviction where evidence of "marginal relevance at

best," which was "far more prejudicial than probative" was admitted at trial). Mr. Libby has met that burden.

No evidence presented to the judge permitted him to consider more probative than prejudicial the evidence of Mr. Libby's sperm on a pair of unauthenticated underwear allegedly worn by K.C. on June 17, 2012. Although K.C.'s description of where and how Mr. Libby touched her "private parts" was fairly vague ("in the front and back" and "inside"), she was very clear on one point: she never saw Mr. Libby's "private parts," and therefore never saw his penis or ejaculate at any time. (Tr. I: 42)

As this Honorable Court is well aware, there are three "steps" a court takes to determine the admissibility of "prior bad acts" in a case.[2] First, prior bad acts may not be admitted to show bad character or propensity to commit the crime charged (which this evidence certainly amounts to). It may only be admitted to show a "common scheme, pattern of operation, absence of accident or mistake, identity, or motive," *Commonwealth v. Copney*, 468 Mass. 405, 412 (2014), which is the basis for which the judge admitted the evidence.

However, *Commonwealth v. Crayton*, 470 Mass. 228, 249 (2014), also presses the third step: even if the evidence is relevant to, say,

---

[2] Mr. Libby denies that the presence of semen on the unauthenticated underwear indicates a "prior bad act." If he masturbated at some point in the privacy of, say, the family bathroom, and used an article of laundry that happened to be a pair of underwear belonging to K.C., that act of masturbation is not a "prior bad act" and is irrelevant to this case.

"motive," as the judge alleged in the instant case, the evidence should nonetheless be excluded if its "probative value is outweighed by the risk of unfair prejudice to the defendant, *even if not substantially outweighed* by that risk." *Id.*[3] Such evidence is "inherently prejudicial" under *Crayton* and the defendant urges this Court to consider the semen on the unauthenticated underwear in that category.

The DNA in the instant case should have been excluded. Admittedly, Mr. Libby's semen was found in K.C.'s underwear, but K.C.—the only percipient witness—claimed she never saw or touched Mr. Libby's penis. Patricia Rivas, K.C.'s mother and first complaint witness, never saw any inappropriate behavior by Mr. Libby or between Mr. Libby and K.C.  And it bears repeating: No one, including the forensic analysts, could say when or how the DNA found itself on K.C.'s underwear—through the laundry or by Mr. Libby wiping himself in the bathroom where heaps of laundry were kept, or by something equally innocent (or more nefarious).

There is no question that the trial judge abused his discretion by admitting this evidence, and the Appeals Court erred when it failed to recognize this fact.

---

[3] The Appeals Court, in a footnote on page 5 of its opinion, claims that because the defense included the possibility of "accident" because it mentioned that Mr. Libby often touched K.C.'s vaginal area while helping her in the bathroom, its reliance on *Crayton* was misplaced. The defense respectfully disagrees.

II.   **DID THE APPEALS COURT ERR WHEN IT RULED THAT THE JURY "COULD [HAVE] REASONABLY CONCLUE[D]" THAT THAT AN ITEM OF EVIDENCE "WAS WHAT THE COMMONWEALTH CLAIMED IT WAS" WHEN THE CHAIN OF CUSTODY HAD BEEN CLEARLY BROKEN?**

The Appeals Court clearly failed to recognize the significance of the fact that two conflicting stories—testified to by K.C.'s mother who may well have had a motive to lie--emerged about the underwear containing sperm apparently tested at the laboratory. First, Ms. Rivas testified that all K.C.'s clothes were bagged, tagged, and taken into custody by the Palmer police. The next day, however, she had signed a stipulation that she herself had brought K.C.'s clothes to Dr. Stephen Boos. Both tales cannot be true, and there is no reason that the judge, or the Appeals Court, expressed that explains why the jury would have reason to "conclude that the item was what the Commonwealth claimed it to be."

In addition, no one with personal knowledge, neither K.C. or her mother, identified the underpants as belonging to K.C. before the jury. A DNA analyst opened a package and told the jury that the item number matched what she received from the police at the laboratory. The unauthenticated underwear went into the jury room during deliberations, over defense objection.

That the issue about the underwear was troubling became clear during jury deliberations. The only substantive question the jury sent to

the judge was about that underwear: "Dear Judge, according to the law, may the rape kit be sealed by healthcare practitioners in the ER and not be able to be opened until the crime lab? Thanks, the jury." The judge refused to answer the question, ignoring request by defense counsel that the judge tell the jury "not to speculate. Remind them of the—" at which time the judge interrupted, responding, "I may not do that." Clearly, DNA and the underwear were central issues considered by the jury—in a case in which presence of semen was not an element of the crime and, under the law discussed *infra*, amount only to improper character evidence.

### III.   DID THE APPEALS COURT ABUSE ITS DISCRETION BY FAILING TO FIND THAT THE FOUR YEARS IT TOOK THE COMMONWEALTH TO BRING MR. LIBBY TO TRIAL REVERSIBLE ERROR UNDER THE UNITED STATES CONSTITUTION AND VIOLATIVE OF MASSACHUSETTS' RULE 36?

Mr. Libby was arraigned on August 22, 2012, and he filed his Motion to Dismiss for a Rule 36 Violation on July 14, 2016, at which time his case had been pending for 1,423 days.  Under Massachusetts law, he established "a prima facie violation of his speedy rights by demonstrating that more than one year elapsed between the return date [here the date of indictment] and trial." *Commonwealth v. Spaulding*, 411 Mass. 503, 504 & n. 3 (1992), citing Mass. R. Crim. P.

2(b)(15) Rule 36 of the Mass. R. Crim. P. govern the speedy trial clock in the Commonwealth.

In addition to the Rule 36 violation, the delay in bringing Mr. Libby's case to trial also violated his right to a speedy trial under the 6th and 14th Amendments to the U.S. Constitution and art. 11 of the MA Declaration of Rights because the period between the Commonwealth's first accusation of Mr. Libby and trial "crossed the threshold dividing ordinary from presumptively prejudicial delay." *Commonwealth v. Butler*, 463 Mass. 706, 710-711 (2013), quoting *Doggett v. US*, 505 US 647, 651-652 (1992) (internal citations omitted). If the accused makes this showing, the court must then consider, as one fact among several, the extent to which the delay stretches beyond the bare minimum need to trigger the claim. *Barker v. Wingo*, 407 US 514 (1972)

In its decision, the Appeals Court agreed—using the abuse of discretion standard laid out in *Commonwealth v. Dirico*, 480 Mass. 491, 496 (2018)—with the trial judge on all of his findings on the complicated defense Rule 36 motion, including the more than six months he required to rule on a motion to suppress that the Commonwealth then appealed, which took this Honorable Court a year and a half to decide. and all other findings on the Rule 36 motions. The defense respectfully suggests to this Court that the judge abused his discretion in making those rulings and the Commonwealth still bears the burden of showing that 1, 058 days were the result of excludable delay (1,120 days if the 62 days between the Rule 36 decision and the trial are counted.

The Appeals Court utterly skirted Mr. Libby's constitutional speedy trial claim, simply postulating that the time "inured to his benefit" because he could then "challenge the victim's recollection." However, that theory ignored the personal prejudice Mr. Libby endured. Mr. Libby concedes that he was not incarcerated pre-trial, but one cannot underestimate the anxiety and concern he experienced: Charges of raping a little girl hung over him, he was subjected to GPS monitoring, and was prevented from seeing his son for those four plus years. Because of the nature of the charges, and the many court dates he had to attend, he had difficulty obtaining and maintaining employment. Those conditions represented substantial prejudice to Mr. Libby and this Honorable Court must consider them when assessing this issue.

## <u>CONCLUSION</u>

For the above stated reasons, this Court should grant further appellate review to clarify the law as it applies to 1) when a judge's decision to admit evidence is based on assumptions and not law or fact and are more prejudicial than probative; 2) when a judge admits evidence that is not properly authenticated and has a broken chain of custody that the jury asks about during deliberations; and 3) the judge's calculation of time when it comes to Rule 36 and constitutional speedy trial priorities. These issues are a matter of important public policy and considering them would be in the interests of justice.

Respectfully submitted,

/s/Suzanne LeVert
Suzanne LeVert
On behalf of Jeremy Libby
203 Washington St. #155
Salem, MA 01970
978-741-0800
BBO #684060
levertlaw@gmail.com

## CERTIFICATE OF COMPLIANCE

I, Suzanne LeVert, certify that this Application for Further Appellate Review complies with the rules of court that pertain to the filing of such papers, including but not limited to Mass. R. A. P. 16(a)(13) (addendum); Mass. R. A. P. 16(e) (references to the record); Mass. R. A. P. 20 (form and length of briefs, appendices, and other documents); and Mass. R. A. P. 21 (redaction).

I also certify that this Brief has been produced using 14-point Century Schoolbook, a proportionally spaced font, and contains words (including headings, footnotes and quotations) which I calculated using the Word Count feature of Microsoft Word for Office 365.

/s/Suzanne LeVert
BBO #684060

## CERTIFICATE OF SERVICE

I, Suzanne LeVert, Esq., hereby certify that I served two copies of the brief by email on February 28, 2020 to:

ADA Katherine MacMahon
Hampden District Attorney's Office
50 State Street
Springfield, MA 01102

/s/ Suzanne LeVert
_____
Suzanne LeVert
BBO #684060
203 Washington Street, #120
Salem, MA 01970
(978)741-0800
Levertlaw@gmail.com

NOTICE:  Summary decisions issued by the Appeals Court pursuant to its rule 1:28, as amended by 73 Mass. App. Ct. 1001 (2009), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

18-P-346

COMMONWEALTH

vs.

JEREMY LIBBY.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

After a jury trial, the defendant, Jeremy Libby, was found guilty of four counts of forcible rape of a child in violation of G. L. c. 265, § 22A.  This appeal centers on the admission of DNA testing results of a pair of underwear that showed the presence of the defendant's sperm cells.[1]  We affirm.

1.  Admission of the underwear and the DNA test results. The defendant argues that the Commonwealth failed to authenticate Exhibit 2 as the underwear belonging to the victim, that the evidence of the defendant's sperm cells being found on the underwear was irrelevant and improperly admitted, and that even if relevant, the DNA evidence was more prejudicial than

---

[1] In his reply brief, the defendant retracted the argument in his principal brief regarding the sufficiency of the evidence. Counsel confirmed at oral argument that this argument was withdrawn.

probative.  The trial judge's decisions to admit evidence as
relevant or properly authenticated, and whether the evidence is
unduly prejudicial, are matters within the judge's discretion
and are reviewed for abuse of discretion.  See Commonwealth v.
Gray, 463 Mass. 731, 751-752 (2012); Commonwealth v. Bonds, 445
Mass. 821, 831 (2006); Commonwealth v. Meola, 95 Mass. App. Ct.
303, 307-308 (2019); Mass. G. Evid. §§ 401, 403, 901(a) (2019).

     a.  Authenticity.  The judge's role in admitting the
underwear was to make a preliminary determination, without
weighing credibility, whether the jury could find by a
preponderance of the evidence that the underwear belonged to the
victim.  See Meola, 95 Mass. App. Ct. at 307-308 & n.13; Mass.
G. Evid. § 104(b) (2019).  The victim's mother took the victim
to the emergency room after the victim disclosed the sexual
assault on June 27, 2012.  The mother testified that the
victim's belongings, including "[t]he outfit she was wearing"
and "the underwear she was wearing" when she went to the
emergency room were "bagged" and "tagged" and then taken by the
Palmer police.  The mother was told to take the victim to see
Dr. Stephen Boos the next day.  Although the mother testified
that she did not personally transport the victim's belongings to
Boos, the parties stipulated that "the underwear contained in
the evidence collection kit numbered 001126, Item Number 1-1-07
. . . was received by Dr. Stephen Boos at Baystate hospital from

2

[the mother] on June 28, 2012."  The jury could reasonably conclude that the item was what the Commonwealth claimed it to be -- the underwear that the victim was wearing on June 27 -- and the judge's preliminary determination to admit the underwear in evidence was not "palpable error."  See id. at 309, quoting Commonwealth v. Leonard, 428 Mass. 782, 786 (1999).[2]

Nor did the judge err in responding to the jury's question whether, "according to law, [with respect to] the evidence obtained in the ER, may the rape kit be sealed by healthcare practitioners in the ER and not be able to be opened until the crime lab?"  The judge firmly instructed the jury "that the evidence in this case is closed.  You have all the evidence before you.  You are to determine this case based on that evidence and based on all of my instructions on the law."  Defense counsel had asked the judge to instruct the jury not to engage in speculation; the instruction the judge gave conveyed the same message in different words.  In her closing argument, defense counsel suggested that the mother had planted the defendant's semen on the victim's underwear.  The judge's response did not foreclose the jury from considering this theory -- ironically, any instruction not to engage in speculation

---

[2] Any claim concerning the chain of custody went to the weight and not the admissibility of the evidence.  See Commonwealth v. Mack, 482 Mass. 311, 318-319 & n.9 (2019).

3

might have done so.  The judge's response was well within his
broad discretion.  See Commonwealth v. Monteagudo, 427 Mass.
484, 488 (1998).

        b.  Presence of sperm cells.  The defendant argues that the
evidence indicating that his sperm cells were present in the
crotch area of the victim's underwear was not relevant because
the Commonwealth did not present evidence as to how the
defendant's sperm got there.  The judge determined that the
evidence was "strikingly probative" of the defendant's motive,
intent, and relationship with the victim.  When the evidence of
the DNA match was introduced, and again in his final charge, the
judge gave limiting instructions stating that the jurors could
not consider that evidence "as a substitute for proof that the
defendant committed the crimes charged," nor as proof of a
"criminal personality or bad character," but solely on the
issues of "motive and/or intent."[3]

        The jury could reasonably infer that the presence of the
defendant's sperm in the crotch of the victim's underwear was
strong evidence that the defendant's relationship with the
victim involved his own sexual gratification.  This evidence was
relevant to prove that the defendant's digital penetration of

_____

[3] At defense counsel's request, the judge did not say that the
jurors could consider the evidence as probative of
"opportunity."

4

the victim was intentional.[4]  Unlike Commonwealth v. McDonagh,
480 Mass. 131, 140 (2018), this evidence did not merely show a
general propensity for sexual attraction toward children, but
rather gave rise to a reasonable inference that the defendant
had a specific sexualized interest in the victim herself, on the
same day when two of the charged sexual assaults occurred.  See
Commonwealth v. Bradshaw, 86 Mass. App. Ct. 74, 78-79 (2014).
The judge did not abuse his discretion in determining that the
DNA evidence was relevant, and that, in combination with the
limiting instruction, any undue prejudice did not outweigh its
probative value.  See McDonagh, 480 Mass. at 143-144.

        c.  Prosecutor's opening statement and closing argument.
Prosecutors are entitled to say in their opening statements what
they in good faith expect the evidence to show, see Commonwealth
v. Qualls, 440 Mass. 576, 586 (2003), and to make closing
arguments based on the evidence introduced at trial and the
reasonable inferences to be drawn from it, see Commonwealth v.
Gerhartsreiter, 82 Mass. App. Ct. 500, 514 (2012).  "Argument

---

[4] The defendant elicited evidence that the victim had a kidney
ailment that led to chronic urinary tract infections and vaginal
itching, and that adults, including the defendant, helped the
victim clean herself.  Accordingly, the judge, with the
defendant's assent, instructed the jury that the Commonwealth
had to prove that the defendant's acts were intentional rather
than accidental.  As the defendant's intent was a live issue in
this case, the defendant's reliance on Commonwealth v. Crayton,
470 Mass. 228, 250-252 (2014), is misplaced.

that properly focuses on the evidence, and that 'falls into the category of enthusiastic rhetoric, strong advocacy, and excusable hyperbole, . . . is not grounds for reversal'" (quotation omitted).  Id., quoting Commonwealth v. Silva, 455 Mass. 503, 515 (2009).

All of the prosecutor's challenged statements and arguments were grounded in the evidence.  In discussing the DNA evidence in particular, the prosecutor exercised commendable restraint. He permissibly "suggest[ed]" to the jury "that it is an eminent reasonable inference that that semen ended up on those underpants because [the defendant] had a sexual attraction to [the victim]."  He did not dwell on this evidence, but instead explained to the jurors that it did not directly prove any element of the crimes with which the defendant was charged, that it was relevant only to the defendant's motive and intent, and that the most important evidence was the victim's testimony.

2.  Speedy trial.  The defendant's trial was held in January 2017, approximately four and one-half years after his arraignment in August 2012.  Much of this time was attributable to the defendant's motion to suppress, which the Commonwealth appealed and the Supreme Judicial Court (SJC) affirmed in part, reversed in part, and remanded.  See Commonwealth v. Libby, 472 Mass. 37 (2015).  On July 18, 2016, the defendant filed a motion to dismiss under Mass. R. Crim. P. 36, as amended, 422 Mass.

1503 (1996), and for violation of his constitutional speedy
trial right.  The motion judge determined that at least 1,129 of
the 1,423 days from arraignment to the filing of the motion were
excludable; that is, no more than 294 days of the 365 days on
the speedy trial clock had elapsed.  On appeal, the defendant
contends that the motion judge erred in his rule 36
calculations.  He further argues, for the first time on appeal,
that the 182 days from the filing of the rule 36 motion to the
trial should be included in the calculation.

In reviewing rulings on rule 36 motions, we defer to the
motion judge's factual findings based on the judge's personal
observations and memory of the proceedings, but make an
independent determination of the correctness of the judge's
application of the relevant legal principles to the facts.  See
Commonwealth v. Dirico, 480 Mass. 491, 496 (2018).

In a chart included in his brief, and by reference to his
memorandum in support of the rule 36 motion, the defendant
disagrees with the judge's decisions to exclude certain periods.
Passing upon whether this qualifies as proper appellate
argument,[5] upon careful consideration of the record and the

_____

[5] See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass.
1629 (2019) (argument section of brief shall contain "the
contentions of the appellant with respect to the issues
presented, and the reasons therefor, with citations to the
authorities and parts of the record on which the appellant
relies"); Commonwealth v. Gray, 423 Mass. 293, 296-297 (1996)

motion judge's comprehensive memorandum of decision, we discern
no error.  The judge properly excluded the entire time that the
motion to suppress was pending.  The motion was complex, and
nothing in the record suggests that the defendant objected to
the delay.  See Commonwealth v. Bourdon, 71 Mass. App. Ct. 420,
428-429 (2008).  The judge's findings that the defendant
acquiesced to the delay after the issuance of the SJC's
decision, and did not object to the delay from February 24 to
March 17, 2016, are likewise supported by the record.  See
Dirico, 480 Mass. at 499; Bourdon, 71 Mass. App. Ct. at 428-429.
The judge properly excluded the delay resulting from the medical
leave of an essential witness.[6]  See Mass. R. Crim. P.
36 (b) (2) (B).  Nor did the judge err in denying the
constitutional speedy trial claim.  The defendant was at liberty
awaiting trial, and his defense was not prejudiced by the
passage of time; if anything, the passage of time inured to his
benefit, allowing him to challenge the victim's recollection and

(claims of error unsupported by reasoned argument and citations
do not rise to level of appellate advocacy).

[6] The defendant's chart asserts, without citation or record
support, that the witness in question never testified at trial;
however, the judge found that the "re-testing of certain items
for DNA material was necessary so that another chemist could
testify as to the results," and that this continuance "was
deemed to be in the interests of justice."  We have no basis to
disagree with the judge's determination.

the Commonwealth's efforts to refresh it.  See _Commonwealth_ v.
_Wallace_, 472 Mass. 56, 70-72 (2015).

We treat as waived the defendant's claim that the 182 days
following the filing of the rule 36 motion consumed the time
remaining on the clock, as he never asserted this claim in the
trial court.  See _Commonwealth_ v. _Turner_, 37 Mass. App. Ct. 385,
386 n.2 (1994).  In any event, we discern no risk of a
miscarriage of justice.  The rule 36 motion stopped the clock,
see _Barry_ v. _Commonwealth_, 390 Mass. 285, 294 (1983), and the
trial began sixty-five days after the motion was decided, still
within the time available under rule 36.

_Judgments affirmed_.

By the Court (Meade,
  Maldonado & Massing, JJ.[7]),

_Joseph F. Stanton_

Clerk

Entered:   December 24, 2019.

---

[7] The panelists are listed in order of seniority.